# SUPREME COURT.

The People of the State of New York and James Murphy and Hugh Smith agt. The New York and Harlem Railroad Company and The Mayor, &c. of the City of New York.

The *common council of the city of New York* have no authority, under the act of the legislature, passed April 6, 1832, entitled "An act to amend an act entitled an act to incorporate the New York and Harlem Railroad Company," passed April 25, 1831, to grant to or permit said railroad company the right to lay or construct a railroad track or tracks in Fourth avenue, Madison avenue, Union square, Broadway, Fulton street, John street, Whitehall street, in the city of New York, or any of them:

Because, 1st. Such a route would be an entirely *new and independent route*, as much so as if pursued under independent authority from the legislature; it being in effect a parallel route, which the legislature have in the 16th section of the act of 1831 reserved to themselves the right to grant to a distinct corporation.

2d. Nor is the proposed new route in any just sense a *mere extension* of the original railroad, as provided by said act of 1832.

*New York Special Term, October,* 1863.

People agt. New York and Harlem Railroad Company.

HEARING on order granted by Justice PECKHAM to show cause why an injunction should not issue against the defendants, the mayor, aldermen and commonalty of the city of New York, restraining them from granting to the New York and Harlem Railroad Company the right to lay or construct a railroad track or tracks in any of the streets or avenues in the city of New York, and from authorizing said company to lay a railway or track in Fourth avenue, Madison avenue, Union square, Broadway, Fulton street, John street, Whitehall street, or any of them, or to break and remove the pavement thereof, or in any manner obstruct said streets, preparatory to or for the purpose of laying or establishing such railroad track or railway therein, and also restraining the New York and Harlem Railroad Company from laying or constructing such railway or track in any of the streets or avenues aforesaid, and from breaking or removing the pavements therein, and from obstructing or incumbering any of such streets or avenues for such purpose, or disturbing or interfering with the carriage-way thereof, or interrupting the travel thereon, and granting a temporary injunction of the same purport against the New York and Harlem Railroad Company in the meantime.

LYMAN TREMAIN, A. R. LAWRENCE, GILBERT DEAN, WALDO HUTCHINS, JOHN H. REYNOLDS, *for plaintiffs.*
JOHN K. HACKETT, CHARLES A. RAPALLO, HORACE F. CLARK, AUGUSTUS SCHELL, JOHN K. PORTER, *for defendants.*

HOGEBOOM, Justice. On the 21st day of April, 1863, the common council of New York passed an ordinance, which was subsequently approved by the mayor, granting permission to the New York and Harlem Railroad Company to extend their railroad and construct a double track from their present Fourth avenue track, between Seventeenth and Fifteenth streets, through Broadway to the foot of

Whitehall street, with an additional single track around Bowling Green and State street, and another additional single track around Union square, with further permission to construct an additional single track to the Fulton ferry, through John street, Burling slip and South street, returning through Fulton street.

Permission was also thereby granted to said company to extend their railroad and construct a double track from their present track in Fourth avenue, through Twenty-third street to Madison avenue, and thence through Madison avenue as far as it is, or hereafter may be opened, with further permission to connect therewith by a single or double track from Fourth avenue to Madison avenue, through Twenty-fourth street.

It was provided in the ordinance that the company should pay to the comptroller of the city, monthly, for the benefit of the city, ten per cent. of the gross receipts from all the travel below Union square upon said authorized extensions. Also, that the company should, at their own expense, keep in repair the pavements between the curbs in the streets occupied or traversed by their extended railroad; should pay a license fee of twenty-five dollars for each car run upon the same, and should conform to some other provisions contained in said ordinance, not necessary to be here particularly enumerated, designed to insure the safety and convenience of the traveling public.

The New York and Harlem Railroad Company, pursuant to another provision in the said ordinance, notified their acceptance of the said ordinance within ten days after its passage.

By a preamble to the said ordinance, it is manifest that the common council relied, for their authority to grant the permission before recited, upon an act of the legislature of the state of New York, passed April 6, 1832, and entitled " An act to amend an act entitled an act to incorporate the New York and Harlem Railroad Company,"

passed April 25th, 1831, which authorized and empowered the New York and Harlem Railroad Company to extend their railroad through such streets in the city of New York as the mayor, aldermen and commonalty of the city might from time to time permit.

And the main questions in this case arise upon the construction to be given to that act : whether the power thereby conferred has been exercised and exhausted; whether the laying down and construction of the railroad tracks, authorized by the ordinance, are a legitimate exercise of the right to extend their railroad, conferred by the amendatory act of 1832; and whether the latter act has been expressly or impliedly repealed by subsequent statutes abrogating the same or inconsistent therewith.

Some of these questions it will be necessary to consider.

The New York and Harlem Railroad Company was incorporated by an act of the legislature, passed April 25, 1831. They were empowered to construct a single or double railroad or way from any point on the north bounds of Twenty-third street to any point on the Harlem river, between the east bounds of the Third avenue and the west bounds of the Eighth avenue, with a branch to the Hudson river, between One Hundred and Twenty-fourth street and the north bounds of One Hundred and Twenty-ninth street. The practical location of the railroad within these prescribed limits would, I think, exhaust the power conferred, and prevent a subsequent change of location, except by consent of the legislature.

The line of the road, it will be observed, was only from New York to Harlem. The location of the tracks (if there were two) would have to be, I think, substantially upon the same route. The permission to build a double track would be construed to mean, I think, two tracks essentially upon the same location, for the purpose of enabling cars to run in opposite directions without detention or collision—and not two essentially different routes through

different streets or avenues, such as would be occupied by parallel railroads. Indeed, the right of granting to other persons or corporations authority to construct parallel railroads, on streets or avenues not occupied by the New York and Harlem Railroad Company, was expressly reserved to the legislature by the 16th section of the same act.

Then came the amendatory act of the 6th of April, 1832, on which the defendants rely. By it, this company were "authorized and empowered, with the permission of the mayor, aldermen and commonalty of the city of New York, to extend their railroad along the Fourth avenue to Fourteenth street in the said city, and through such other streets in the said city as the mayor, aldermen and commonalty of said city might from time to time permit, subject to such prudential rules as were prescribed by this act, and as the said mayor, aldermen and commonalty, in common council convened, might prescribe."

By this act, the railroad, which before terminated at Twenty-third street, was permitted to be extended, that is, continued or prolonged, to Fourteenth street. This was ten streets further south upon the same avenue. But it was foreseen that public convenience and travel might require its further extension, and I think this was intended to be in the same general direction. It could not be extended further north, for it already extended in that direction to the Harlem river, and there were no streets beyond that river. The intent of the legislature was, I have no doubt, that it might be extended further south, if the interest of the community should require, and through such other streets, proper to accomplish that purpose, as the mayor, aldermen and commonalty might from time to time permit; not necessarily to terminate at the end of Fourth avenue, at the junction of Fourth or Fifth street, for it was foreseen that the public accommodation might require it to be carried further down; not necessarily to terminate at the end of the Bowery, for a large portion of the popu-

lation and business of the city was still below that; not necessarily, perhaps, pursuing the route of either of these streets—at all events, not necessarily ending at their southern terminus, but through such other streets as the city authorities might permit or prescribe, consistently with the main purpose of the act. At the end of the Bowery, several streets diverged to the south, or in that general direction. The precise route was not intended to be defined, but this was, I think, designedly left to the sound discretion of the common council, having reference to the traveling and business interests of that crowded mart; and it was to be extended through such other streets as the mayor, aldermen and commonalty might from time to time permit. I see no reason to doubt that this was a continuous power, left to be exercised, from time to time, as the wants of the community should require. It was not therefore a power which was spent by a single grant or permission; but might be repeatedly exercised according to the exigency of the case.

Whether the power, once exercised and acted upon by the laying down of a track in accordance with the permission given, could be recalled, the track broken up, and a new route prescribed, is a question which is not necessary to be decided, and which I shall not discuss—it has its difficulties.

But I am strongly inclined to think that the extension authorized by this act was a longitudinal and not a lateral one. A lateral road is more properly a branch than an extension. It is spoken of under that name in the first section of the act of 1831, where authority is given to construct a branch to the Hudson river—that is, a road or route diverging from the main trunk of the railroad. So by the first section of the amendatory act of May 12, 1836, authority is given to alter and change the route or location of the branch of their railroad, which is to be constructed from the Fourth avenue to the Hudson river. So by the

first section of the act of May 7, 1840, the right is granted to build a road through the county of Westchester, " extending thence northwardly to an intersection of the New York and Albany Railroad Company's line of road, and the right of extending a branch eastwardly to the state of Connecticut."

In saying that I think the extension authorized by the first section of the act of 1832 was intended to be longitudinal and not lateral, I do not mean that it should pursue the same precise direction with that portion of the road to which it was attached, not in any degree diverging from such a course, but that it should have the same general direction as a southern, southeastern or southwestern direction, and not a direction to opposite or widely divergent points of the compass.

For example, it is very possible that under the act of 1832, the New York and Harlem Railroad Company might, with the permission of the local authorities, if they had not located any other route, have diverged to the west at Fourteenth street, and passed down Broadway. There seems to be no absolute requisition that they should continue on the Fourth avenue below Fourteenth street; and there is no other street or avenue at that point on which they could pass, except Fourteenth street, and no street, after such divergence, by which they could so soon return to the same general course as they had before pursued as Broadway. But it is a different question, whether, after having practically located their road by a double track below Fourteenth street, through the Fourth avenue, the Bowery, Broome and Centre streets to the lower end of the park, used it in that location for a series of years, and maintained it in full operation to the present time, insisting still upon retaining that route, they can, in addition, locate and operate an entirely new and supplemental route through Sixteenth street to Union park, and thence through Broadway

to the foot of Whitehall street. I think they cannot, and in part for these reasons :

1. Such a route would be an entirely new and independent route, as much so as if pursued under independent authority from the legislature to another corporation. It is, in effect, a parallel route, which the legislature have, in the 16th section of the act of 1831, reserved to themselves the right to grant to a distinct corporation. It would give to this company the right to operate a double track in two locations entirely distinct. This was not intended by the legislature. This power was not conferred by the act of 1831 ; and although the act of 1832 makes no mention of a limitation to a double track, it must be construed in connection with the charter of 1831, being an amendment thereof, and not enlarging the powers of the corporation in this particular.

The effect of the defendants' interpretation is to authorize this corporation, with the consent of the local authorities, to lay and construct railroads over every unoccupied street and avenue of the island of Manhattan. It is unreasonable to suppose that the legislature intended to invest this company, even under the superintendence of the common council, with powers and privileges so sweeping and comprehensive. The act must receive a reasonable interpretation, confining it substantially to the main purposes of its original enactment, except so far as additional powers are plainly conferred.

2. Nor is this new route, in any just sense, a mere extension of the original railroad. That road had an obvious limitation, by the terms of the charter, to a single route, though with a double track. It was designed to open a railroad communication between New York, at Twenty-third street, and Harlem. Below that point it was, probably, supposed that the public could be advantageously served by stages and other conveyances. By the act of 1832, permission was given, under certain limitations, to

extend this route further south, doubtless with a view to public accommodation in the more southern portion of the city. In 1840, permission was given to extend it in the other, the northerly direction. In 1845, by the act of May 14th of that year, this power was conferred in more distinct and ample terms, to continue their road to a point on the Hudson river, opposite Albany. But it was probably never imagined, even by those interested in the corporation, that these acts vested the company with authority to establish parallel lines of railroad over the intervening territory between New York and Albany. Nor is it, in my opinion, a just construction of this act, to give it a wider scope in regard to its extension at the southern terminus, further than required by the plain terms or obvious meaning of the language employed. It may extend through such other streets as the common council may designate, but only through such other streets as may subserve the leading object of the extension, to wit, a continuation of the road to more southern portions of the island.

I think, further, that a reasonable interpretation of the act requires that the extension should be made from the terminus of the road already constructed, so as to be a legitimate continuation and prolongation thereof. It was to go further, not to return back. It was to be continued, not to branch off. It was to be a single route, not several routes. It was to be an extension, and not a branch.

I am not able to give this act any other construction. I therefore conclude that the permission attempted to be granted by the ordinance of the 21st April, 1863, was not warranted by the terms, intent or fair interpretation of the amended charter of 1832. This view is sufficient to dispose of the main question in the case, and makes it unnecessary for me to consider such of the other questions presented as relate to the supposed repeal of this act, by the passage of other acts inconsistent therewith.

There is an additional ground on which the defendants

rest the justification of their proceedings in this case, and that is : that, independent of any statutory grant or authority, the permission granted by the common council to the New York and Harlem Railroad Company is maintainable as a lawful exercise of power granted to the common council under the ancientDongan and Montgomery charters. But to this view of the case I think there are several answers :

1. The permission granted to the railroad company was, by the terms thereof, confessedly based upon the authority conferred by the amended charter of 1832. It professed to be derived from that source, and no other. Under that all the parties acted, and there is some reason for saying that to that the parties should be limited.

2. But whether so or not, it is no longer a debatable question, at least in this tribunal :

1. That the legislature have, notwithstanding these charters, the right to make grants of railroad privileges and franchises over the streets and avenues of the city, and that when this power is exercised it is superior to and exclusive of any power which previously resided in the local authorities ; and,

2. That the local government has no right to grant railroad privileges or establish railroads in cities, independent of legislative action and approval.

I must therefore overrule this ground of defence.

I think it is also settled, upon authority, that all public streets and highways are for the use of the people of the whole state, whether located in town or country ; that the interest in such use or the ownership thereof is *publici juris ;* that the appropriation of such streets to private or corporate use, without authority of law, under the consequent obstruction of them, and impediments to travel occasioned thereby, constitute a nuisance and justify an injunction, and that the people of the state are the appropriate parties to seek and enforce the necessary remedy.

Hence, in this case the action is well brought in their behalf.

If so, it would not furnish a sufficient objection to the grant of an injunction, even if the other plaintiffs were improperly joined. I cannot say they are so; for although they might not have a good cause of action if the defendants were proceeding lawfully under valid grants, they may, nevertheless, sustain serious damages by the acts of the defendants, and, if such acts are unlawful, perhaps be entitled to the preventive remedy of injunction.

There are one or two other objections peculiar to one of the defendants, to wit, the corporation of New York, which it is necessary to consider:

1. It is said that this defendant cannot be prosecuted in a civil action otherwise than in the first judicial district.

2. That this defendant has no interest in the subject matter of the suit or injunction, and is not a necessary or proper party to the action.

3. That on the plaintiffs' own showing there is no cause of action, and no ground for an injunction against such defendant.

I will examine these questions briefly:

1. Section 1 of the act of 14th of April, 1860 (*chap.* 379), declares that "the supreme court in the first judicial district, the court of common pleas, and the superior court of the city of New York, shall have exclusive jurisdiction of all actions or special proceedings wherein the mayor, aldermen and commonalty thereof are made a party defendant."

This language is very comprehensive, but, I think, it never could have been intended to locate all actions in the city of New York, in which, whatever might be the cause of action, or wherever situated, or however numerous the parties might be, the corporation of the city was made one of the defendants. If such was the intention the law ought to be speedily repealed. It is susceptible of another interpretation, which is more agreeable to the probable intention

of the legislature, and I think it should receive such inter-pretation. It may read that in actions in the first judicial district, the supreme court, the court of common pleas and the superior court shall be the sole tribunals to try causes in which the corporation is impleaded. Even this is a more liberal construction than was, I think, intended by the legis-lature.

I think the object of the legislature was to limit the jurisdiction to the specified tribunals in cases where the corporation was the sole defendant; or else, where the action was to recover a claim against the corporation. This is a reasonable inference from the phraseology of the second section, and I should give it that construction if it were necessary to decide that question in the present instance; which it is not necessary to do for reasons to be presently given.

2. Nor is it necessary to pass definitively upon the ques-tion whether a cause of action is stated in the complaint against the corporation, or whether it is a necessary or proper party to the suit. Notwithstanding the case referred to in the defendants' points, and decided in the first district, I am inclined to think the mayor, aldermen and common-alty of New York were proper parties to the action, inas-much as the object of the action is not only to obtain the injunction, but to annul or declare void the ordinance, in maintaining which this defendant may claim and apparently has, an important pecuniary interest to the extent of ten per cent. of the gross receipts from travel below Union square, doubtless expected to reach a very large amount.

3. But, upon the facts stated in the complaint, I do not see any cause for an injunction against the corporation. There is no allegation whatever, that they are about to do or that they threaten any act whatever obstructing or incumbering the streets or otherwise, in execution of the permission granted, nor is it alleged, or does it appear, that the railroad company, in executing the ordinance, are the

agents of the corporation, but it is rather to be inferred that they are independent contracting parties.

For these reasons, I am of opinion that the motion for an injunction against the mayor, aldermen and commonalty of the city of New York should be denied, and the temporary injunction dissolved, with ten dollars costs; but as against the other defendant, the New York and Harlem Railroad Company, that the motion for an injunction should be granted, and the temporary injunction continued; ten dollars costs of making and opposing the application to abide the event of the action.*

---

\* NOTE.—It would seem that within the principles stated in this opinion, the Harlem Railroad Company have an undoubted right to extend their road from its present terminus in Park Row, into and through Broadway to the Battery, unless the power conferred by the act of 1832 has been exercised and exhausted. Because it is stated in the opinion " that a reasonable interpretation of the act requires that the extension should be made from the terminus of the road already constructed, so as to be a legitimate continuation and prolongation thereof. It was to go further, not return back. It was to be continued, not branch off. It was to be a single route, not several routes. It was to be an extension, and not a branch." It is true that this language was used in reference to the original terminus of the road in Fourteenth street; but it is entirely applicable to a still further extension of the road, unless, as before stated, the power to extend it has been exhausted. And this point appears to be conclusively settled by the learned judge where he says: " The precise route was not intended to be defined, but this was, I think, designedly left to the sound discretion of the common council, having reference to the traveling and business interests of that crowded mart, and it was to be extended through such other streets as the mayor, aldermen and commonalty might from time to time permit. I see no reason to doubt that this was a *continuous power,* left to be exercised from *time to time* as the wants of the community should require. It was not therefore a power which was *spent by a single grant of permission,* but might be *repeatedly exercised* according to the exigency of the case." This, unquestionably, is a fair and honest interpretation of the act. Consequently, whatever could have been legitimately done in extending the original road, under the permission of the common council, *can now be done under like permission,* as the power to permit is continuous in the common council.

· Admitting, then, that the power to continue the road from Park Row through Broadway to the Battery is unquestioned, let us see what difference it would make, within the principles of this decision, whether the continuation commenced at Fourteenth street, instead of Park Row, and went through Broadway to the Battery, intersecting the present track at the junction of Park Row and Broadway? Such a route would undoubtedly be an extension of the Harlem railroad longitudinally in the same general direction further south, having its commencement at Fourteenth street and its terminus at the Battery. It is true there would be a parallel branch in the road; but would that be a violation of the act? If so, the present railroad,

# SUPREME COURT.

## JOSEPH ALLEN agt. ADAM L. STARRING, JACOB G. WODRIG and another.

A judge of the supreme court made an order in *supplementary proceedings,* that the judgment debtor appear and be examined before a referee. At the appointed time the parties appeared, but the referee was absent. The judgment creditor immediately obtained an order from *another judge,* appointing another referee and reference :

*Held,* 1. That the *first* proceedings were still in force, and the creditor could have applied to the judge who granted that order for the appointment of another referee, or of another time and place for the hearing before the same referee.*

2. The judge who granted the *second* order, on motion made to him to vacate it, should have granted the motion.

Whether the *referee,* in the *first* proceedings, on application by the creditor, could have appointed another time for the hearing, and summoned the debtor before him? *Quere ?*

---

as now constructed, has been a violation of the act ever since it was built; for it has a *lateral* branch running from Centre street *through Grand street to the Bowery,* and up Bowery to its junction with Broome street. Probably the common council, nor the Harlem Railroad Company, never dreamed that they were violating the statute when the railroad was built in this manner; and if the road as now built could not reasonably be considered a violation of the act, certainly a branch running in the *same general direction,* without altering the location of the commencement or terminus of the extended road, could hardly be considered such a violation.

Suppose, as is conceded, that it might have been; that the railroad had been built originally from Fourteenth street through Broadway to the Battery, instead of the route that it was built, it would have been an extension through *one street only ;* and the act is very clear that it might be extended *" through such other streets* in the said city as the mayor, aldermen and commonalty of said city might from time to time permit." Would the extension, then, through Broadway have prevented the extension of a branch through Fourth avenue and Bowery and other streets intersecting the Broadway road before it reached its southern terminus? Could the latter route be considered " an entirely new and independent route," which it is supposed the act of 1832 forbids? Is it not more in harmony with the broad and comprehensive language of the act to suppose that the different routes which were authorized " through such other streets," should be left entirely to the judgment and discretion of the common council, who, it must be presumed that the legislature understood, had the general guardianship of the city, and the welfare of its citizens in traveling through it by public conveyances, sufficiently to entrust it with such discretion?—REP.

* NOTE.—In *Reynolds* agt. *McElhone* (20 *How.* 454), it was held that where the judge did not appear at his office at the time appointed, the order was not spent, but the defendant must wait a reasonable time for his appearance. The defendant, having on the same day paid over money in his possession, was held in contempt.